RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MICHIGAN STATE A. PHILIP RANDOLPH INSTITUTE;
MARY LANSDOWN; ERIN COMARTIN; DION
WILLIAMS; COMMON CAUSE,

        *Plaintiffs-Appellees,*

    *v.*

RUTH JOHNSON, in her official capacity as Michigan
Secretary of State,

        *Defendant-Appellant.*

Nos. 16-2071/2115

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-11844—Gershwin A. Drain, District Judge.

Decided and Filed: August 17, 2016

Before: MOORE, GILMAN, and STRANCH, Circuit Judges.

─────────────────

## COUNSEL

**ON MOTION AND REPLY:** Denise C. Barton, Erik A. Grill, Adam Fracassi, Joseph Y. Ho, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. **ON RESPONSE:** Mary Ellen Gurewitz, SACHS WALDMAN, P.C., Detroit, Michigan, Mark Brewer, GOODMAN ACKER, P.C., Southfield, Michigan, for Appellees. **ON BRIEF:** John J. Bursch, BURSCH LAW PLLC, Caledonia, Michigan, John D. Pirich, Andrea L. Hansen, Kevin M. Blair, HONIGMAN MILLER SCHWARTZ AND COHN LLP, Lansing, Michigan, for Amici Curiae.

MOORE, J., delivered the opinion of the court in which GILMAN and STRANCH, JJ., joined. GILMAN, J. (pp. 16–18), delivered a separate concurring opinion.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.    Defendant-Appellant Ruth Johnson, Michigan's Secretary of State (the "Secretary"), moves for a stay pending appeal of the district court's July 22, 2016 and August 1, 2016 orders granting the plaintiffs' motion for a preliminary injunction.  The district court's preliminary injunction prohibits the Secretary from enforcing Public Act 268 ("PA 268"), a law that eliminates straight-party voting in Michigan.  The district court found that Michigan's elimination of straight-party voting violated the Fourteenth Amendment of the U.S. Constitution because it placed a burden on voters—particularly African-American voters—and that this burden was not justified by Michigan's stated interests in enacting the law.  The district court also found that PA 268 violated Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  For the reasons discussed below, we **DENY** the Secretary's motion for a stay pending appeal.

**I.  BACKGROUND**

Michigan has offered "straight-party" (or "straight-ticket") voting since 1891.  *See* 1891 PA 190, § 14.  Straight-party voting allows a voter to vote for all candidates of their desired political party by making a single mark designating the selection of that political party, rather than voting for each partisan candidate individually.  *See, e.g.*, R. 1-7 (2008 Macomb Cty. Ballot) (Page ID #206).  Prior to 2015, Michigan attempted to abolish straight-party voting on two occasions:  first in 1964, and again in 2001.  R. 20-2 (State Fiscal Agency Bill Analysis at 2) (Page ID #579).  On each occasion, the law was rejected by referendum.  *Id*.  Straight-party voting has thus been available to Michigan citizens for an uninterrupted period of 125 years.

In 2015, the Michigan legislature passed PA 268, which eliminated straight-party voting in Michigan.  *See* 2015 PA 268.  PA 268 also appropriates $5 million "to the department of state to purchase voting equipment to implement the elimination of straight party ticket voting."  *Id.* at § 795c(2).  Because PA 268 includes an appropriation, it cannot be repealed by referendum.  *See Mich. United Conservation Clubs v. Sec'y of State*, 630 N.W.2d 297, 298 (Mich. 2001).  PA 268

was signed into law by the governor in 2016 and became effective immediately; the law will thus remove straight-party voting from Michigan ballots beginning in the November 8, 2016 general election. *See* 2015 PA 268; R. 1-15 (Baxter Decl. at 4) (Page ID #289).

Plaintiffs—the Michigan State A. Philip Randolph Institute, Common Cause, and several individual voters—filed a complaint against the Secretary in the U.S. District Court for the Eastern District of Michigan on May 24, 2016, alleging that PA 268 violated the Fourteenth Amendment of the U.S. Constitution, Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, and the Americans with Disabilities Act, 42 U.S.C. § 12132. R. 1 (Compl. at 1) (Page ID #1); *see also* R. 9 (Am. Compl. at 5–6, 24–30) (Page ID #394–95, 413–19).

Plaintiffs included with their complaint an expert report prepared by Kurt Metzger, a demographer and former Regional Information Specialist with the U.S. Census Bureau in Detroit, Michigan. R. 1-11 (Metzger Report at 2–4) (Page ID #221–24). Metzger's statistical analysis demonstrated "that African Americans are more likely to use the straight party voting option and that its elimination will disproportionately affect African American voters." *Id.* at 12 (Page ID #231). The plaintiffs also attached declarations from several county election administrators that estimated that the elimination of straight-party voting would increase the time that it takes an individual to vote and thus cause a demonstrable increase in wait times for voting. *See, e.g.*, R. 1-15 (Rozell Decl. at 3) (Page ID #283); R. 1-15 (Baxter Decl. at 4) (Page ID #289); R. 1-15 (Swope Decl. at 4) (Page ID #297).

Plaintiffs moved for a preliminary injunction on May 27, 2016. R. 4 (Mot. for Prelim. Inj. at 1) (Page ID #318). The Secretary filed a response in opposition, R. 20 (Def. Resp. in Op. at 1) (Page ID #536), and the plaintiffs replied, R. 21 (Pl. Reply to Def. Am. Resp. at 1) (Page ID #532). The district court held a hearing on the motion on July 14, 2016. R. 26 (Prelim. Inj. H'rg Tr. at 1) (Page ID #743).

On July 21, 2016, the district court issued an opinion and order granting the plaintiffs' motion for a preliminary injunction. *Michigan State A. Philip Randolph Institute v. Johnson*, --- F. Supp. 3d ----, 2016 WL 3922355, at *1 (E.D. Mich. July 21, 2016). The district court first concluded that the plaintiffs were not likely to succeed on the merits of their ADA claim because

it did not appear that any of the plaintiffs had standing to bring such a claim. *Id.* at \*5. The district court found that the plaintiffs were likely to succeed on their claims brought under the Equal Protection Clause and Section 2 of the Voting Rights Act, however. First, with regard to the Equal Protection Clause claim, the district court evaluated PA 268 under the *Anderson/Burdick* framework and determined that the state's asserted interests did not outweigh the burden that PA 268 placed on voters. *Id.* at \*7–9. Second, in analyzing the plaintiffs' claim under Section 2 of the Voting Rights Act, the district court concluded that the plaintiffs had demonstrated that the elimination of straight-party voting would disproportionately impact African-American voters and, applying the factors articulated in *Thornburg v. Gingles*, 478 U.S. 30, 36–37 (1986), the district court concluded that the disproportionate burden was, in part, "caused by or linked to 'social and historical conditions' that have or currently produce discrimination against" African-American voters. *Mich. State A. Philip Randolph Inst.*, 2016 WL 3922355, at \*10 (quoting *Gingles*, 478 U.S. at 47). Because the district court found that the plaintiffs would suffer an irreparable injury—the restriction of their right to vote—if the law were to go into effect, and because "the burden on the state would be to merely reinstate the ballots used in the 2014 election cycle," the district court concluded that the preliminary injunction factors favored the plaintiffs. *Id.* at \*13–14. The district court subsequently issued two revised orders imposing the preliminary injunction. R. 25 (Prelim. Inj. at 1–37) (Page ID #706–42); R. 30 (Prelim. Inj. at 1–3) (Page ID #835–37).

The Secretary filed her first notice of appeal on July 25, 2016. R. 27 (Notice of Appeal) (Page ID #795). The Secretary also moved in the district court for a stay of the preliminary injunction pending appeal. R. 29 (Def. Mot. for Stay Pending Appeal) (Page ID #797). On August 2, 2016, the Secretary filed a separate notice of appeal to the second revised order. R. 33 (Notice of Appeal) (Page ID #861). Unhappy with the district court's briefing schedule on the emergency motion, *see* Appellant Mot. at 2, the Secretary filed an emergency motion in this court for a stay of the injunction pending appeal. On August 15, 2016, the district court issued an opinion and order denying the Secretary's emergency motion to stay the preliminary injunction. *Mich. State A. Philip Randolph Inst. v. Johnson*, No. 16-cv-11844, 2016 WL 4267828, at \*1 (E.D. Mich. Aug. 15, 2016). The Secretary asked that we rule on her motion for a stay pending appeal by August 17, 2016.

## II. DISCUSSION

We evaluate four factors in considering a motion for a stay pending appeal under Federal Rule of Appellate Procedure 8(a):

> (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.

*Serv. Emp. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 343 (6th Cir. 2012) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). These four factors "are interconnected considerations that must be balanced together." *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006). "As the moving party, [the Secretary] has the burden of showing" that a stay is warranted. *Serv. Emp. Int'l Union Local 1*, 698 F.3d at 343. We conclude that the Secretary has not met this burden.

We first consider the likelihood that the Secretary will prevail on the merits of the appeal, and thus we must consider the likelihood that the Secretary can "show that the district court abused its discretion in granting the preliminary injunction." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 380 (6th Cir. 2008). Under the abuse-of-discretion standard, "[t]he injunction will seldom be disturbed unless the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 312 (6th Cir. 1998).

## A. Equal Protection Clause Challenge

The Secretary first asserts that the district court erred in holding that the plaintiffs were likely to succeed on their Equal Protection Clause challenge. "The right to vote is a 'precious' and 'fundamental' right," *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966)), and it is clear that this right "'is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.'" *Id.* (quoting *League of Women Voters v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008)). Specifically, "[t]he Equal Protection Clause applies when a state either classifies voters in disparate ways, or places restrictions on the right to vote." *Id.* (internal

citations omitted). Here, the plaintiffs have asserted that their right to vote is restricted by PA 268 because, in eliminating straight-party voting, PA 268 will increase waiting times at polling locations and will cause more voters to miscast ballots due to confusion.

We apply the framework established by the Supreme Court in *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), and *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983), to evaluate Equal Protection Clause challenges to voting restrictions. *See Green Party of Tenn. v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015). "Under the *Anderson-Burdick* test, the court must first 'consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.'" *Id.* at 693 (quoting *Anderson*, 460 U.S. at 789). Second, the court "must 'identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Id.* "Finally, it must 'determine the legitimacy and strength of each of those interests' and 'consider the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.*

"Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent" of the burden that the law imposes on the rights of voters. *Burdick*, 504 U.S. at 434. If a statute imposes a "'severe'" burden on the right to vote, we apply strict scrutiny and the law "must be narrowly tailored and advance a compelling state interest." *Hargett*, 791 F.3d at 693 (quoting *Burdick*, 504 U.S. at 434). By contrast, if the law imposes a "'reasonable' and 'nondiscriminatory'" burden, "the statute will be subject to rational basis [review] and survive if the state can identify 'important regulatory interests' to justify it." *Id.* "If the burden lies somewhere in between, courts will weigh the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Id.* (internal quotation marks and alterations omitted).

In granting the plaintiffs' motion for a preliminary injunction, the district court determined that PA 268 imposed a burden that fell in between the two extremes of this framework, and accordingly balanced the injury imposed by the law with the state's asserted interest in eliminating straight-party voting. *See Mich. State A. Philip Randolph Inst.*, 2016 WL 3922355, at *6. In its motion for a stay pending appeal, the Secretary insists that PA 268 "impacts only the manner of voting—not the right to vote." Appellant Mot. at 3. It is clear,

however, that how a state chooses to regulate the *manner* that a person must cast a ballot undoubtedly impacts the individual right.  Indeed, the very premise of the *Anderson/Burdick* framework is that "all election regulations[] have an impact on the right to vote" to some degree. *Burdick*, 504 U.S. at 434.  The question that we must answer is what the "character and magnitude of the asserted injury" on the right to vote is here, *see Anderson*, 460 U.S. at 789, and we do not believe that the Secretary has shown a likelihood that the district court erred in finding that PA 268 imposes a burden on the right to vote that justifies the application of more than rational-basis review, but less than strict scrutiny.

The district court identified two primary burdens that PA 268 would impose on the right to vote.  First, by increasing the time that it takes to vote, the elimination of straight-party voting would increase the wait times for voting; and second, because the ballots maintained the same graphics identifying the political parties on the top of the ballot—removing only the bubble to vote for all candidates of that party—PA 268 would cause voter confusion and thus increase the risk of individuals not having their votes counted.  *Mich. State A. Philip Randolph Inst.*, 2016 WL 3922355, at *7–8.  Moreover, because Metzger's report demonstrated that there were "extremely high" correlations between the African-American voting population and the use of straight-party voting, the district court found that African Americans would be disproportionately burdened by PA 268.  *Id.* at *7.

We first consider the district court's conclusion that PA 268 would impose a burden on voters by increasing the time that it takes to vote.  The district court credited the testimony of Joseph Rozell, the Director of Elections in the Elections Division of the Office of the Oakland County Clerk, who testified that "[t]he use of straight party voting significantly reduces the amount of time that it takes a voter to mark his or her ballot and its elimination will significantly increase the amount of time that it takes to vote the ballot."  R. 1-15 (Rozell Decl. at 3) (Page ID #283); *Mich. State A. Philip Randolph Inst.*, 2016 WL 3922355, at *7; *see also* R. 1-15 (Baxter Decl. at 4) (Page ID #289); R. 1-15 (Swope Decl. at 4) (Page ID #297).  The evidence presented to the district court suggested that nearly 50% of all voters use straight-party voting in Michigan. *See* R. 1-11 (Metzger Report at App. A) (Page ID #250–56).  By increasing the time that it takes for an individual voter to complete his or her ballot, PA 268 will accordingly cause longer lines

at polling places and increase the wait time to cast a vote. R. 1-15 (Rozell Decl. at 3) (Page ID #283). Indeed, Rozell estimated that "the elimination of straight-party voting could increase wait time as much as forty minutes in Oakland County." *Mich. State A. Philip Randolph Inst.*, 2016 WL 3922355, at *7 (citing R. 1-15 (Rozell Decl. at 4) (Page ID #284)). Longer lines at the polls "reduce[] the confidence voters have that their votes are counted," impose additional monetary costs on voters that must stand in line, and may even turn some voters away from voting at all. R. 1-3 ("Managing Polling Place Resources" Caltech/MIT Study at 11–12) (Page ID #52–53).

Of particular significance is Metzger's conclusion that African-American voters in Michigan "are more likely to use the straight party voting option" in Michigan, and to a significant degree. R. 1-11 (Metzger Report at 1) (Page ID #220). Specifically, the district court noted that, "although the average straight-party voting rate in Michigan is about 50%, the straight-party voting rate in African-American majority districts was 67% in 2012, and 73.5% in 2014." *Mich. State A. Philip Randolph Inst.*, 2016 WL 3922355, at *2, 7 (citing R. 1-11 (Metzger Report at App. A) (Page ID #250–56)). In Royal Oak Charter Township and Highland Park—cities with population that are 95.6% and 93.1% black, respectively—the straight-party voting rate was approximately 82% in 2014. R. 1-11 (Metzger Rep. at App. A) (Page ID #254, 256). Indeed, "[t]he five cities with straight-party voting rates greater than 75%[] were all majority African American." *Mich. State A. Philip Randolph Inst.*, 2016 WL 3922355, at *2. The district court accordingly found "that PA 268 presents a disproportionate burden on African Americans' right to vote" and, "as Metzger concludes, the elimination of straight-party voting would likely have a larger impact on African-American voters." *Id.* at *7; *see* R. 1-11 (Metzger Report at 13) (Page ID #231). Because African-American majority districts in Michigan such as Detroit have also historically faced some of the longest wait times in the state, *see* R. 1-15 (Baxter Decl. at 5–6) (Page ID #290–91), the increase in long lines occasioned by the elimination of straight-party voting will impact these voters to an even more significant degree.

The district court also concluded that PA 268 would place a burden on the right to vote because the law would cause voter confusion and thus increase the risk that ballots would be marked incorrectly and would not be counted by the ballot scanner. *Mich. State A. Philip Randolph Inst.*, 2016 WL 3922355, at *8. Specifically, the ballots that Michigan intends to use

in the 2016 general election maintain a listing of each political party at the top of the ballot, along with a graphic representing each party. *See* R. 1-16 (Gongwer Report at 1) (Page ID #396). These are substantially the same graphics that appeared on previous ballots in the straight-party voting section, and are in substantially the same location, but the bubble for selecting the party to vote that party's candidates on a straight-party ticket has been removed. *Compare* R. 1-16 (Gongwer Report at 1) (Page ID #396), *with* R. 1-7 (2008 Macomb Cty. Ballot) (Page ID #206). The district court credited testimony from county election officials that "[t]he uniform opinion among the county clerks is that this is going to cause great confusion and that voters, used to being able to vote straight-party, will circle the party they want or otherwise seek to mark this new ballot display, thinking that this is the way to vote straight-party as they have done in the past." *Mich. State A. Philip Randolph Inst.*, 2016 WL 3922355, at *8 (quoting R. 1-15 (Rozell Decl. at 5–6) (Page ID #284–85)).

The Secretary presented no testimony or expert reports in the district court to counter these facts, nor does the Secretary present arguments in her motion for a stay that persuasively demonstrate that the district court committed clear error in its factual conclusions. Rather, the Secretary insists that the district court made an error in its legal conclusion regarding the degree of the burden imposed by PA 268 because filling out bubbles for candidates "is the very *act* of 'voting,'" and thus cannot constitute a burden, or at least a burden that deserves more than rational-basis review. Appellant Mot. at 3–4. But again, this proves too much. In assessing the burden imposed on voters by a state's electoral mechanisms, courts may undoubtedly consider whether the state's practices will cause long lines and delays at polling places and how these lines and delays may impact the right of a voter to cast his or her ballot. *See, e.g.*, *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477–78 (6th Cir. 2008).

The Secretary also places a strong emphasis on the fact that most states do not have straight-party voting; if the clear majority of states do not offer straight-party voting, the Secretary asserts, it is impossible to conclude that the absence of straight-party voting imposes an unconstitutional burden. *See* R. 26 (Prelim. Inj. H'rg Tr. at 29) (Page ID #771). Importantly, however, comparing the isolated voting practice of one state with the isolated voting practice of another state is not always an apples-to-apples comparison. This law presents a strong example.

Declarations submitted by the plaintiffs report that Michigan ballots contain substantially more candidates than other states, and thus the practice of straight-party voting in Michigan may save far more time than straight-party voting in other states. *See* R. 1-15 (Baxter Decl. at 2) (Page ID #287); R. 1-15 (Swope Decl. at 2) (Page ID #295). Moreover, Michigan does not allow early voting,[1] and Michigan does not permit no-excuse absentee voting, *see* Mich. Comp. Laws §§ 168.758 & 168.759, making the average wait times at physical polling locations on Election Day of tremendous significance to Michigan voters. In the 2012 general election, Michigan had the sixth-highest estimated average wait time as compared to other states. *See* 1-3 ("Managing Polling Place Resources" Caltech/MIT Study at App. 1) (Page ID #78). Each of these facts demonstrates that the option of straight-ticket voting may impact Michigan voters in a way that it does not impact voters in Ohio, for example. It is accordingly not enough for Michigan to simply rely on the lack of straight-party voting in other states; the necessary question is how this law interacts with other voting practices in Michigan, and the burdens this law places on voters who vote within Michigan's electoral framework.

In considering the above, we conclude that the Secretary has not shown a likelihood of demonstrating that the district court erred in finding that the burden placed on voters by PA 268 requires more than rational basis, but less than strict scrutiny. We next turn to consider the district court's evaluation of the state's asserted interests. Here, the state has advanced two primary interests for PA 268: "fostering an engaged electorate that vote for candidates and issues" and "encouraging the electorate to vote for the nonpartisan issues on the ballot." R. 20 (Def. Mot. in Op. at 23) (Page ID #562).

In eliminating straight-party voting, PA 268 requires voters to fill in individual bubbles for each candidate. A voter will now have to look, at least briefly, at each section of the partisan ballot in order to identify and fill in the desired bubble. Contrary to the state's assertions, it is far from evident that this will "foster[] an engaged electorate." *Id.* As the district court noted, "the new ballot will still inform the voters of the party affiliation of every partisan candidate," *Mich. State A. Philip Randolph Inst. v. Johnson*, 2016 Wl 3922355, at *8, and as discussed above,

---

[1]*See* Michigan Dep't of State, *Elections & Voting: Early Voting*, *available at* http://www.michigan.gov/sos/0,1607,7-127-29836-202483--F,00.html (last accessed August 12, 2016).

graphics representing each of the parties appearing on the partisan ballot are prominently on display at the top of the ballot, just as before. The ballot will still inform voters of the available political parties, and the party affiliation of each partisan candidate will still appear beside the candidate's name. Accordingly, a voter desiring to vote for all of the candidates of his or her desired political party may still do so without reading any of the candidates' names, without knowing the office for which the candidate is running, and without knowing a single fact about either—the only change, as the state admits, will be that a voter now "can't do it through one bubble." R. 26 (Prelim Inj. H'rg Tr. at 31–32) (Page ID #773–74). The state has presented nothing apart from vague speculation that suggests that a voter will make a more informed choice in filling in each individual bubble rather than choosing to fill in one bubble for a straight-party vote.

The state also asserts that eliminating straight-party voting will reduce the likelihood that a voter will skip the non-partisan section of the ballot. *Id.* at 37 (Page ID #779). As discussed above, however, the district court credited testimony from county election officials that there is a likelihood that voters will still circle the party graphic at the top of the ballot, believing that they are casting a straight-party vote (as, perhaps, they have consistently done for decades). Accordingly, although we acknowledge that the state has a legitimate interest in reducing confusion over which section of the ballot needs to be individually completed, this interest is diminished by the new confusion that PA 268 will likely cause.

In sum, the district court credited unrebutted evidence in the record demonstrating that PA 268 will increase the time that it takes to vote, particularly in African-American communities where straight-party voting is prominent and where lines are often already long. The district court also found that the law was likely to increase voter confusion and miscast ballots. Although this burden is not severe, it is also not slight. In the face of this burden, the state has offered only vague and largely unsupported justifications of fostering voter knowledge and engagement. As the plaintiffs assert, there is nothing in the record "that straight party voters vote blindly, that they are less informed than other voters or that they fail to complete their ballot at a lower rate." Appellee Resp. at 11 (emphasis removed). After evaluating the burdens imposed by the law and the state's asserted justifications, we hold that the Secretary has not shown that there

is a substantial likelihood that she will prevail on appeal in demonstrating that the district court erred in evaluating the plaintiffs' Equal Protection Clause claim.

## B. Voting Rights Act Challenge

The Secretary further asserts that she can demonstrate a substantial likelihood that the district court erred in its analysis under Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.  Appellant Mot. at 6.  Section 2 provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ."  52 U.S.C. § 10301(a).  Importantly, "Section 2, unlike other federal legislation that prohibits racial discrimination, does not require proof of discriminatory intent."  *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 363 (6th Cir. 2002).  Rather, Section 2(b) provides:

> A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).  "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  *Gingles*, 478 U.S. at 47.  The Supreme Court in *Gingles* listed several factors "that might be probative of a § 2 violation," drawing from the Senate Judiciary Committee Majority Report that accompanied the bill.  *Id.* at 36.  These factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or

other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* at 36–37. The Section 2 framework discussed above is most often used in assessing vote-dilution claims, rather than vote-denial or vote-abridgement claims. *See Veasey v. Abbott*, --- F.3d ----, 2016 WL 3923868, at *17 (5th Cir. July 20, 2016). Nonetheless, "courts have entertained vote-denial claims regarding a wide range of practices," and "Section 2's plain language makes clear that vote denial is precisely the kind of issue Section 2 was intended to address." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 239 (4th Cir. 2014); *see also Gingles*, 478 U.S. at 45 n.10 ("Section 2 prohibits all forms of voting discrimination, not just vote dilution.").[2]

---

[2]In *Ohio State Conference of the NAACP v. Husted ("Husted II")*, we held that Section 2 of the Voting Rights Act applied to the plaintiffs' challenge to Ohio's early-voting procedures because the statutory language of Section 2 indicates that "Section 2 applies to *any* discriminatory 'standard, practice, or procedure . . . which results in a denial or abridgement' of the right to vote." 768 F.3d 524, 552 (6th Cir. 2014). Our opinion "read the text of Section 2 and the limited relevant case law as requiring proof of two elements for a vote denial claim. First, as the text of Section 2(b) indicates, the challenged 'standard, practice, or procedure' must impose a discriminatory burden on members of a protected class, meaning that members of the protected class 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Id.* at 554. "Second, the Supreme Court has indicated that that burden must be in part caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class.'" *Id.* (quoting *Gingles*, 478 U.S. at 47). We noted that "[i]n assessing both elements, courts should consider 'the totality of the circumstances,'" including consideration of the *Gingles* factors. *Id.*

*Husted II* affirmed the district court's order granting the plaintiffs a preliminary injunction, but the Supreme Court stayed the district court's preliminary injunction on September 29, 2014, in advance of the 2014 election. *See Husted v. Ohio State Conference of the NAACP*, 135 S. Ct. 42 (2014). Because the plaintiffs' request for a preliminary injunction became moot after the 2014 election, we vacated our *Husted II* opinion. *Ohio State Conf. of the NAACP v. Husted*, No. 14-3877, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014). In setting out the framework for its Section 2 analysis in the present case, the district court acknowledged that *Husted II* was not binding because it had been vacated, but considered *Husted II* persuasive authority. 2016 WL 3922355, at * 6 n.2.

The district court concluded that the plaintiffs had demonstrated that PA 268 imposed a disproportionate effect on African-American voters because the Metzger report "demonstrated that African-Americans are more likely to use straight-party voting than white voters, and 'its elimination will disproportionately affect African-American voters.'" 2016 WL 3922355, at *10 (quoting R. 1-10 (Metzger Report at 1) (Page ID #220)). The district court further found that this burden was "linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class,'" citing *Gingles* factors 2, 5, 6, 7, 8, and 9 as relevant. *Id.* at *13. The district court drew from available news articles and facts from Metzger's report that demonstrated that African Americans in Michigan "tend to vote overwhelmingly for Democrats," that African Americans "continue to bear the harmful effects of past discrimination," and that "[r]ecent political campaigns in Michigan . . . have been marred with direct and indirect racial appeals." *Id.* at *11–13.

We do not doubt that these facts are true; it is a more challenging question, however, to say that the plaintiffs have established that PA 268 "interacts with" these conditions "to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. The district court found that "racist policies such as redlining and housing discrimination" in Michigan contributed to the racial polarization of metropolitan areas. *Mich. State A. Philip Randolph Inst.*, 2016 WL 392355, at *13. If black voters in Michigan disproportionately use straight-party voting, and the absence of straight-party voting in Michigan will increase wait times, then PA 268 may "interact[] with" the racial polarization of communities in Michigan "to cause an inequality" because African-American communities will likely face longer wait times in the absence of PA 268 than non-African-American communities. *Gingles*, 479 U.S. at 47. Although it is a closer question whether the Secretary can establish a likelihood of success on appeal with regard to the Section 2 claim, nonetheless, this does not alter the fact that the likelihood-of-success-on-appeal factor weighs in

The Secretary argues that it was inappropriate for the district court to do so. Appellant Mot. at 4. The framework set forth in our *Husted II* opinion for evaluating a Section 2 vote-denial claim, however, has recently been adopted both by the Fifth Circuit sitting en banc and the Fourth Circuit. *See Veasey v. Abbott*, No. 14-41127, --- F.3d----, 2016 WL 3923868, at *17 (5th Cir. July 20, 2016) (en banc); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014). We agree with *Husted II*—and our sister Circuits—that the two-part framework discussed above is appropriate when evaluating a Section 2 vote-denial claim, and the district court did not err in its decision to use the *Husted II* framework to evaluate the plaintiffs' challenge here.

favor of the plaintiffs because of our conclusion regarding the Equal Protection Clause claim discussed above.

## C.  Irreparable Injury and the Public Interest

We also conclude that the Secretary is not likely to establish that the district court abused its discretion in granting an injunction because we find the district court appropriately evaluated the remaining preliminary-injunction factors.  As the district court stated, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed.  A restriction on the fundamental right to vote therefore constitutes irreparable injury."  *Mich. State A. Philip Randolph Inst.*, 2016 WL 3922355, at *13 (quoting *Obama for America*, 697 F.3d at 436).  Of particular significance here, the district court's grant of a preliminary injunction maintained the status quo in Michigan that was in place for 125 years:  maintaining straight-party voting, where "the record does not show that there were any problems with the old ballot" that contained the straight-party option.  *Id.* at *14.  Consideration of the factors evaluated by the district court in granting a preliminary injunction also informs the remaining factors that we must evaluate in determining whether to stay the district court's opinion.  *See Serv. Emp. Int'l Union Local 1*, 698 F.3d at 343.  This case does not involve the potential disruption of complicated election-administration procedures on the eve of Election Day; rather, denying the Secretary's request for a stay here will merely require Michigan to use the same straight-party procedure that it has used since 1891.  We find that the Secretary has not met her burden to demonstrate that a stay pending appeal of the district court's order is warranted.

## III.  CONCLUSION

For the foregoing reasons, the motion for a stay pending appeal is **DENIED**.

_____

**CONCURRENCE**

_____

RONALD LEE GILMAN, Circuit Judge, concurring.  I fully concur in the lead opinion and write separately only to emphasize a few points.  First, our ruling today is not the end of the case.  We are simply deciding that the Michigan Secretary of State has not met her burden of demonstrating that a stay of the district court's preliminary injunction is warranted.  In reaching this decision, we are limited to the admittedly one-sided proof available at this stage of the litigation because the Secretary, for whatever reason, did not timely submit any proof contradicting the plaintiffs' evidence.

For instance, various appellate briefs supporting the Secretary's position now characterize Metzger's report, which was included with the plaintiffs' complaint, as "junk science" and attack its alleged "cherry picking" of data.  But the Secretary never submitted any contrary proof to the district court.  She did not even request limited discovery until July 13, 2016, the day before the hearing on plaintiffs' motion for a preliminary injunction and over seven weeks after the motion was filed.  By that point, the district court reasonably concluded that her request was not timely.

The Secretary will have an opportunity to present contrary evidence in subsequent proceedings.  Perhaps the Secretary's proof at later stages of this case will overcome the plaintiffs', but at this early stage of the case we are limited to the proof that is presently in the record.

Turning to that record, the lead opinion concludes that PA 268 burdens the right to vote by increasing voter disenfranchisement in at least two ways.  First, voter confusion resulting largely from the continued existence of the party vignettes on the ballots is likely to cause an increase in erroneous ballots due to some voters circling the vignettes rather than marking the bubbles in the partisan section of the ballot.  The second burden involves longer lines at polling places, particularly in the African-American community.

With regard to the longer lines, I believe that precisely defining the burden at issue in this case is paramount. The consequential burden in my view is not—as the Secretary and the amici who support her argue—simply the extra time that each straight-party voter will have to spend marking additional bubbles. Nor is it the longer lines at polling places resulting from the aggregation of that extra time per se. Rather, it is the fact, as supported by the current record, that the longer lines will deter citizens from voting.

Among plaintiffs' proof is a declaration from Daniel Baxter, the Director of Elections in the Office of the Detroit City Clerk. He flatly states that "[l]onger lines will deter voters from voting." Chris Swope, the Ingham County Clerk, makes a similar a statement. Taken together, along with Metzger's report identifying the positive correlation between straight-party voting and the African-American community, the above declarations support the district court's preliminary injunction. And, unlike the potential disruptions in other cases that involve voter-identification requirements or the elimination of early voting, I see no grave harm to the state of Michigan in allowing straight-party voting to remain on the ballot this November, as it has for the past 125 years.

I next want to allay the unwarranted intimations by the Secretary and the amici supporting her that, by denying the stay, we are establishing a permanent constitutional entitlement to straight-party voting. This framing is misleading for two reasons. First, as mentioned above, we are at the preliminary stage of this case, and the ruling that the evidence now supports might well be different at a later stage. Second, even if the proof does not change, voting-regulation challenges under the Equal Protection Clause and Section 2 of the Voting Rights Act are jurisdiction-specific inquires. Whether a practice is permissible under a given set of facts is thus not legally determinative of whether it is permissible under a different set of facts.

The lead opinion identifies several Michigan-specific factors—the unusually long ballots and the unavailability of both early voting and no-excuse absentee voting—that exacerbate the burdens that the elimination of straight-party voting will have in Michigan. These conditions might not always exist in Michigan. Record evidence implicitly acknowledges this point. For instance, the declaration of Mary Lansdown, the President of the Randolph Institute's Flint

Chapter, notes that "the line problems would not be so bad if we had early voting like some states have, or if some people could vote absentee without a reason."

Moreover, the confusion concern that we have identified could be greatly reduced by, for example, eliminating the party vignettes from the ballots. The continued presence of the vignettes on the ballots certainly appears to be a legislative oversight—perhaps one precipitated by the Michigan legislature's haste to create a purportedly better-informed electorate. In any event, just because the present record supports the district court's preliminary injunction maintaining the option of straight-party voting for this November's general election does not mean that the state must always permit straight-party voting.

For all of the above reasons, I concur in the lead opinion.